# EXHIBIT C

## AMERICAN ARBITRATION ASSOCIATION
### International Centre for Dispute Resolution

| | |
|---|---|
| JOHN F. AMATO and FELIX P. HERLIHY,<br><br>*Claimants,*<br><br>– *vs* –<br><br>ISTITHMAR WORLD PJSC,<br><br>*Respondent.* | Case No.: 50 166 T 00493 10 |

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in the Contracts of Employment entered into between John F. Amato ("Amato") and Istithmar PJSC ("Istithmar" or the "Company") and between Felix P. Herlihy ("Herlihy") and Istithmar on September 11, 2006, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby make the following Final Award.

In making my findings and award, I have considered the credibility of the witnesses, the expert testimony and reports, my views of the weight to be given to the documentary evidence and testimony of witnesses, including the experts and their reports, and the Parties' oral and written arguments. I have also considered the inferences that could or could not be drawn from the testimony, reports and documents.

### I.    INTRODUCTION

This dispute arises in connection with two extensively negotiated complex Contracts of Employment signed on September 11, 2006 (the "Contracts"), one between Amato and Istithmar and one between Herlihy and Istithmar. The Contracts, which were identical in their substantive terms and in all material respects, set forth the terms of Claimants' employment, which commenced August 30, 2006, as Co-Chief Investment Officers and Managing Directors of Istithmar World PJSC (f/k/a Istithmar PJSC).

Istithmar is an investment company headquartered in, Dubai, United Arab Emirates. It is a subsidiary of Istithmar World Holdings LLC ("IW Holdings"), which is owned by Dubai World. Dubai World and its numerous affiliates, including Istithmar, are vehicles

through which the Dubai Government invests and manages its assets.  Amato and Herlihy claim numerous breaches of their Contracts by Istithmar, including continually diminishing, interfering with and subverting their authority to manage Istithmar's investment activities, and failing to compensate them as required by the Contracts.  They claim Istithmar's misconduct entitled them to resign for what the Contracts call "Good Reason", and to receive, in addition to the payments Istithmar made to them following their resignation, substantial carried interest compensation, which Istithmar has failed to provide.  In addition to carried interest, Claimants seek to recover other damages, including punitive damages, allegedly caused by Istithmar's breaches of the Contracts and other misconduct, including its fraudulent conduct in making false representations to Claimants, to entice them both to assume and to continue their employment with Istithmar, and conduct that allegedly harmed Claimants' reputations.

In its Answer, Respondent denies the breach of contract, fraudulent inducement and other claims.  Respondent maintains that the Contracts gave Claimants the right to a possible carried interest program and, if a program was not implemented within six months after they joined Istithmar, to a specific remedy which Claimants did not exercise for almost three years.  Istithmar claims that although Claimants waived their breach of contract claims and their right to resign for Good Reason, it nonetheless provided them all of the payments and benefits provided for in their Contracts after they had tendered their Good Reason resignation.  Istithmar maintains that, since no carry program was ever approved, adopted or implemented, Claimants' demand that the Arbitrator create, and assign a value to, a hypothetical carry program is not a remedy available under their Contracts or the law.  Further, Istithmar maintains that even if a carry program having the Material Terms specified in the Contracts for such a program had been implemented, it would not have yielded Claimants any income given that Istithmar's investment portfolio lost billions of dollars of value during their three-year tenure as Co-Chief Investment Officers.

## II.    PROCEDURAL HISTORY

Claimants Amato and Herlihy commenced this arbitration by filing a Demand for Arbitration ("Demand") on July 26, 2010.  Respondent Istithmar filed an Answer to the Demand on August 17, 2010.

## A.    The Arbitration Agreement and Governing Law

The Parties' arbitration agreement, at Annex II, p. 10 of the Contracts, stated:

> If any dispute arises between the parties with respect to this contract, such dispute shall be submitted to binding arbitration for resolution in New York City in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect. The decision shall be final and binding on both parties, and any court of competent jurisdiction may enter judgment upon the award. Each party shall pay its own expenses, including legal fees, with respect to any such dispute unless the arbitrator determines otherwise.

Annex I, p. 7 of the Contracts provided that "[t]his contract and your terms of employment shall be governed by and construed in accordance with, the laws of the State of New York."

**B.      The Parties' Counsel**

Amato and Herlihy are represented in this proceeding by Allan J. Arffa, Marc Falcone, Maria Keane, Jeanhee Hong and Andree J. Goldsmith of Paul, Weiss, Rifkind, Wharton & Garrison LLP. Istithmar is represented by Theodore O. Rogers, Jr., Robin D. Fessel, Adam B. Dressner and Timothea G.P. Letson of Sullivan & Cromwell LLP.

**C.      The Arbitration Tribunal**

Dana H. Freyer was appointed by the ICDR as sole arbitrator on November 17, 2010.

**D.      The Arbitration Proceedings**

The proceedings were conducted pursuant to the Employment Arbitration Rules of the American Arbitration Association. An initial preliminary hearing was conducted by telephone on December 17, 2010, at which a schedule for further proceedings was fixed. Extensive exchanges of documents were conducted pursuant to the initial and subsequent procedural orders.

Lengthy prehearing briefs, expert reports and evidence were submitted. Eleven days of hearings were conducted in New York City on August 1-4, September 14, 15, 26 and 27, and October 19-21, 2011. Eight witnesses testified: For Claimants: Claimants Felix Herlihy and John Amato, expert witnesses Louis H. Singer and Gary A. Herrmann of Morgan, Lewis & Bockius, and damages expert Timothy Cummins. For Respondent: Sayed Shuja Ali, Managing Director, Portfolio Management, of Istithmar, David Jackson, former Chief Executive Officer of Istithmar, and expert witness Professor Colin C. Blaydon, Josephine Buchanan Professor of Management and Dean Emeritus of the Tuck School. Opening arguments were heard and numerous exhibits were offered by the Parties and discussed at the hearing. The Parties each

filed lengthy post-hearing submissions. The Arbitrator heard closing arguments on January 18, 2012. Following closing arguments, the Parties made additional submissions.

## III.    THE FACTS

### A.    Claimants' Background

Before joining Istithmar, Claimants had extensive experience as executives in the financial services industry, including at Lehman Brothers. In the Spring of 2004, Herlihy and Amato joined the Agnelli family office, where they tried unsuccessfully to create for the Agnelli family a U.S. investment vehicle under the names IFIL USA and IFIL Capital Partners (collectively, "IFIL"). Ultimately, the Agnellis did not provide any capital for investments by IFIL. After leaving IFIL, Claimants founded Anglesea Capital Partners but never obtained funding or made an investment through that firm.

### B.    Claimants' Employment Contracts: Negotiation and Execution

In early 2006, Claimants began discussing with David Jackson, then Istithmar's Chief Investment Officer, their joining Istithmar with responsibility for North American investing working from New York. In the Summer of 2006, after Jackson became Istithmar's Chief Executive Officer, the discussions shifted to potential positions for Claimants as Co-Chief Investment Officers for Istithmar, reporting to Jackson and dual based in Dubai and New York City.

Claimants, principally Herlihy, took the lead in drafting the Contracts, which were extensively and carefully negotiated. Claimants were not represented by counsel in the negotiations but used as models terms with which they were familiar from their prior employment contracts. Istithmar was advised by Cleary, Gottlieb, Steen & Hamilton LLP ("Cleary") and its internal counsel, Nick Hornung. Many drafts of the Contracts were exchanged between August 10 and September 11, 2006, when they were signed.

Istithmar's Chairman, Sultan Ahmed Bin Sulayam, signed the Contracts for Istithmar. (Claimants Exhibits ("CX") 29 and 33) The Contracts were valid for an initial term of 3 years and 4 months and provided that Claimants would serve as Co-Chief Investment Officers, with an annual base salary of $350,000, an annual cash bonus "with a target range of between US$450,000 and US$650,000" and with the minimum guaranteed for calendar years 2006 (subject to proration) and 2007, but not guaranteed for subsequent years. (§ 2.3 and Annex II) Claimants' place of work was to be "[p]rimarily New York City and Dubai". (§ 1.8)

## C.    Claimants' "Good Reason" Resignations

On July 8, 2009, Claimants sent David Jackson a joint letter stating they were resigning for "Good Reason" effective immediately ("Notice of Resignation"). (CX 32) The letter did not provide the 3-month prior notice required by § 1.11 for termination of the Contracts; nor did it contain the 10-day prior notice of the conduct or the reasons that were the basis for the resignation, required by the "Good Reason" definition in Annex II of the Contracts in order to give Istithmar an opportunity to cure.

On July 13, 2009, Mr. Jackson wrote Claimants requesting they provide the requisite notice of reasons so that Istithmar would have the opportunity to exercise its right to cure ("Notice of Reasons"). (CX1846)  Claimants responded on July 16, 2009, with a summary of the conduct on which their resignations were based.  (CX 2027)  These included essentially the same conduct upon which Claimants' breach of contract claims in this arbitration are based, to wit:

(i)  incidents of material diminution in duties or responsibilities from their duties and responsibilities immediately prior to such change;

(ii)  alteration of the constitution and governance rules of the Istithmar Investment Committee from the Majority vote requirement set forth in the Contracts;

(iii)  removal of Claimants from the Investment Committee;

(iv)  transfer of investment decision-making from the Investment Committee to the Executive Fiscal Group on which Claimants were not represented;

(v)  the separation of real estate assets from their portfolio of investments without giving Claimants the title of Co-Head of Private Equity;

(vi)  failure to establish and maintain a New York City office; and

(vii)  failure to grant Claimants the Participation Interests in Investments allegedly required by Section 2.4 and Annex II of the Contracts within six months of their commencement of employment or at all.

Claimants Notice of Reasons stated they did not think the Company had the ability to cure the conduct about which they complained.  Respondent maintains that Claimants notice was untimely and denied Respondent the opportunity to cure in that all of the alleged breaches occurred at least a year before they resigned and some occurred within weeks of their joining Istithmar.  Claimants maintained that they complained orally to Mr. Jackson about some

of these matters from time to time, but they did not send any written complaints or notices of breach before July 2009.

Notwithstanding what it claims were defects in Claimants' notice, Istithmar paid or provided to each of them more than $1 million plus the benefits that are called for by Section 1.11 of the Contracts for a "Good Reason" resignation.  Claimants accepted those payments but dispute Istithmar's failure also to pay them the value of the Participation Interests in a carry program to which they claim entitlement under Section 1.11 and in this arbitration.  I address that issue below.

Claimants' employment with Istithmar terminated on October 8, 2009, three months following their Notice of Resignation.

### D.     Breach of Contract Claims

Claimants assert that Istithmar committed the following material violations or breaches of the Contracts:  (i) prevented Claimants from overseeing all of Istithmar's investments; (ii) removed real estate investments from Claimants' overview and management without giving them the titles of "Co-Heads of Private Equity"; (iii) prevented Claimants from reporting directly to the CEO of Istithmar; (iv) prevented Claimants from managing a team of investment professionals; (v) failed to maintain Claimants as members of Istithmar's Investment Committee; (vi) failed to allow Claimants to be dual based in New York City and Dubai; and (vii) failed to pay Claimants carried interest and to implement a carried interest program.

In (i)-(v) above, Claimants are effectively complaining that Istithmar, without their consent, materially diminished their duties or responsibilities from those promised in the Contracts in material violation of the Contract.  Two of the Contracts' four grounds for a "Good Reason" resignation are (i) without Claimants' consent, "any material diminution in your duties or responsibilities from your duties and responsibilities immediately prior to such change" and (ii) "a material violation of this contract by the Company." (Annex II, p. 9)  Claimants included in their Notice of  Reasons for their resignations the conduct complained of in (i)-(v) as justifying their resignations under the above two grounds.  (CX 2027)

Claimants asserted that Istithmar's failure to establish and maintain a New York City office with appropriate infrastructure and staffing fell within the second of the "Good Reason"  grounds in that it was a "material violation" of the Contracts. (*Id.*)  They alleged that

the failure to grant them Participation Interests was both a material violation of the Contracts and a basis under ground (iv) of the Contracts' definition of "Good Reason" to resign.

There is no doubt that almost from the beginning of their employment, Claimants' responsibilities were changed from time to time. Dubai World took measures to increase its oversight of Istithmar's and other Group members' investment activities. To that end, the membership and structure of the Istithmar Investment Committee and the investment committees of other Group members were revised on several occasions. Almost immediately after Claimants commenced employment, Istithmar appointed Khaled Al Kamda to the new-created position of Vice-Chairman of Istithmar. Claimants maintain that Mr. Al Kamda and his successor, Adel Al Shirawi, thereafter effectively functioned as CEO, meaning that in reporting to Mr. Jackson, Claimants were no longer reporting to Istithmar's CEO as their Contracts provided. Claimants also were not given the titles of Co-Heads of Private Equity when the real estate investments were removed from their portfolio, as the Contracts contemplated they might be, and certain Istithmar investment professionals were assigned to work on projects under the direction of Mr. Al Kamda, his successor, and other managers. The resignation for "Good Reason" grounds, on which Claimants rely, include a "material" diminution in Claimants' job responsibilities from their responsibilities "immediately prior to such change." Any reduction in job responsibilities therefore was to be measured against their duties immediately prior to such change, not necessarily against the responsibilities set forth in the Contracts.

I find that Claimants were fully aware of these changes, as well as the delays in opening the New York office and the need to spend most of their time in Dubai, and accepted them by continuing to work without any notice of breach until July 2009, long after these events had occurred. They then elected to raise them as grounds for their resignation for Good Reason and accepted the severance and other payments the Contracts provided for such conduct. The only questions remaining with respect to Claimants' breach of contract claims are whether Istithmar was also required to pay Claimants carried interest under Section 1.11 when they resigned, whether Section 1.11 is a liquidated damages clause which bars Claimants from pursuing additional damages for the alleged breaches, and, if it is not, to what, if any additional damages Claimants are entitled.

**E.**     **The Contracts' Carry Program Terms**

At the core of Claimants' complaints is their failure to receive carried interest compensation which they maintain they were guaranteed under the Contracts. Claimants assert that Istithmar breached the Contracts by failing to (i) implement a carried interest program, (ii) grant them Participation Interests in such a program, and (iii) pay them carried interest when they resigned for "Good Reason". These claims present the following issues : 1. Whether the Contracts guaranteed that Istithmar would implement a carried interest program? 2. If there was such a guarantee, what were the promised terms? 3. If a program was not implemented, was it a breach of the Contract? 4. What remedies were and are available to Claimants if Istithmar failed to implement a program and grant them Participation Interests?

1.     Principles of Contract Interpretation

My analysis must begin with the Contracts' terms. "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, (N.Y. 1990).

> "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed...Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the fact of the instrument...A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous...nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case...Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency."

*Eli Lilly and Co. v. Emisphere Technologies, Inc.*, 408 F. Supp.2d 668, 680 (S.D.Ind. 2006).

2.     Did the Contracts Guarantee Claimants the Right to Participation Interests?

The Contracts stated that Claimants "*shall* be granted Participation Interests as set forth in Annex II of this contract." (§ 2.4) (Emphasis added) Annex II provided that Claimants "*will* be granted participation interests in the *existing investments* made by [Istithmar]" and in investments to be made in the future by Istithmar and through any investing partnerships or other similar alternative investment vehicles (the "Partnerships") established by Istithmar. (Annex II,

8

p.10) (Emphasis added)  The Contracts provided that Claimants' Participation Interests shall not be decreased and the Material Terms shall not be changed without their written consent. (Annex II, p. 10)

The Material Terms of Claimants' Participation Interests provided that Participation Interests would  be granted to Claimants "*[u]pon the approval of any carried interest program by the Chairman*" and that the Participation Interests will "equal to 1.5% *of any realized profits on any Investments* made prior or during your employment…" (Annex II, p.11) (Emphasis added)  The Contracts clearly conditioned the grant of Participation Interests to Claimants upon the Chairman's approval of a carried interest program.

The Contracts also made clear that Participation Interests were to be limited to investments held by Istithmar when Claimants commenced employment and to investments made during their employment and within 60 days after termination of their employment, if such termination was based upon their resignation for Good Reason. Notwithstanding Claimants' argument to the contrary, I find that the Contracts did not provide for them to receive Participation Interests in investments that had been exited by Istithmar prior to their employment. The Contracts stated that Claimants will be granted participation interests in *the existing Investments* made by Istithmar.  "Existing" means ""to continue to be", "to be present." (The American Heritage Dictionary, 2d College Edition)  By definition, "existing investments" do not include investments that had been exited by Istithmar when Claimants commenced employment. I read the Material Terms' reference to Claimants' Participation Interests including "1.5 % of any realized profits on any Investments made prior or during [Claimants'] employment…." to refer to investments that, even if made prior to Claimants' employment, were still held by Istithmar when Claimants commenced employment.  That is the only way this provision can be reconciled, as it must be, with the undertaking at page 10 of the Contracts to grant Claimants participation interests in "existing Investments".  Mr. Herlihy confirmed as much, agreeing that "[i]f [someone] owned 100 shares of IBM last year and sold them for $100,000, [they] don't have an existing investment in IBM…" (Tr. 3200:11-14)

The Material Terms also clearly provided that Participation Interests, once granted, would apply only to "realized profits" (not unrealized gains) of Istithmar Investments. "Realized profits" means actual profits, i.e., proceeds after deducting taxes and expenses imposed upon the fund or investing entity.

9

Claimants acknowledged at the hearing that the carried interest program to be developed would be a company-wide program applicable to all the investment professionals, and the Contracts confirm that. For example, the Material Terms describe the intended allocation of Participation Interest Percentage Points to various employees and apply numerous other provisions to all "Investment Professionals", not just to Claimants.

It is undisputed and I find that no carry program was implemented at Istithmar prior to or after Claimants' resignation, and no Participation Interests, as defined in the Contracts, were ever granted to Claimants or to other Istithmar employees. Claimants maintain their Contracts gave them an absolute right to participation in a carry program, that such a program was approved by the Chairman, and that Istithmar breached the Contracts by failing to grant them Participation Interests. Claimants seek, among other relief, the value of what they claim their interests would have been had a program on terms that were discussed during their three years of employment – and not merely comprised of the Material Terms found in their Contracts -- been implemented.

Claimants have offered evidence of the Parties' course of performance in working to develop a carry program throughout their employment as evidence that Istithmar understood it was obligated to implement one. However, the limitations on that obligation were clearly set forth in the Contracts, including the requirement that the Chairman approve any program. The parties' course of performance evidences, at best,  that Istithmar worked with Claimants to develop a carry program during a period of global financial turmoil and crisis and huge drops in the asset values of Istithmar's and Dubai World's investments, and that the terms under consideration at various times, including three-year pooling of investments and the exclusion of all real estate investments from the carry pool, were different in significant respects from the Material Terms. Cleary was working under Mr. Herlihy's direction on developing a carry program. Claimants knew that, during the course of their employment, the terms of a carry program had not yet been finally determined, and certainly should not have had expectations that a program following their Contracts' Material Terms would have been implemented.

Claimants also offered, over Respondent's objection, evidence of efforts to develop a carry program, of statements allegedly made by Mr. Jackson, and a communication from Respondent's lawyer following their resignation to show that Respondent believed Claimants have an enforceable right to carried interest. Respondent, while disagreeing with

Claimants' characterization of this evidence, claimed that, in any event, it was either privileged and/or constituted inadmissible exchanges made in the context of settlement negotiations. The evidentiary record, as well as Claimants' Demand for Arbitration, support Respondent's position that discussions between Istithmar representatives and Claimants after they submitted their resignations were post-dispute settlement discussions. I thus strike such evidence from the record but note that, in any event, it would not alter my findings and conclusions in this case given the clarity of the Contracts with respect to the issues before me.

I hold that their Contracts gave Claimants a right to Participation Interests in a company-wide carried interest program if one were approved by the Chairman for all eligible personnel. I must therefore determine whether the Chairman ever approved such a carry program.

3.   Was a Carry Program Approved by the Chairman?

I find that no specific carry program was approved by the Chairman. Claimants maintain that Istithmar's Chairman approved the *implementation* of a carried interest program on the date he signed their Contracts, thereby satisfying the approval condition. On September 11, 2006, Istithmar's Chairman Sultan Ahmed Bin Sulayem signed a "Delegation of Authority" ("Delegation"), which stated: "I am authorizing Istithmar *to create a structure* along the following lines..." (CX 1617) (Emphasis added) The Delegation's terms differed from the Material Terms in Claimants' Contract in that it provided for three-year pooling of investments by year of investment, rather than one-year pooling by year of exit per the Material Terms and for a "clawback" provision for each three-year pool of investments. The Delegation recognized that a "more detailed plan ...will need to be developed to support this program..." Istithmar's CEO, David Jackson, was delegated discretion to develop the plan and to keep the Chairman informed of the development process.

Istithmar maintains that no carried interest program was ever approved. Mr. Jackson, who drafted the Delegation, testified that it was not the approval of a carry program contemplated by the Contracts. (Tr. 2090:2-5) Claimants offered, as further evidence that the Delegation constituted the requisite "approval" of a carry program, a September 2006 email from an Istithmar employee to the Chairman thanking him for approving the carry "structure" (CX 699), and an August 2009 email from a former employee, who had lost her job and was claiming additional compensation, which referred to the Chairman's approval of the "program

11

instructions" in the Delegation. (CX 774)  Claimants also rely on Mr. Ali's and Mr. Jackson's employment contracts which said "employee is entitled to participate in the company's approved carry program." (CX 2031, 2169, 2170)  Mr. Jackson testified that since no such program was ever established, that provision never became operative. (Tr. 2410: 25-2411:7) Moreover, neither of them ever received any participation or carried interest. (Tr. 2936:17-25)

   The terms of a carried interest program were never finalized or approved.  Rather, many different terms were discussed and proposed.  In 2006, Istithmar retained Cleary to advise on a potential carried interest program for Istithmar investment professionals.  Mr. Herlihy represented Istithmar in this process, working closely with Cleary.  The program Cleary and Herlihy worked on differed in key respects from the Material Terms in the Contracts.  For example, real estate assets were to be entirely excluded, as were certain other assets. Herlihy himself directed Cleary to develop documentation reflecting the three-year pooling and clawback requirements of the Delegation, rather than using the parameters of the Material Terms.

   As of March 2007, six months after Claimants had joined Istithmar, it had not implemented a carry program and Claimants could have resigned for Good Reason.  They claim they did not exercise their right to resign for Good Reason at that time in reliance upon Mr. Jackson's representations to them after an April 2007 Board meeting that the carry program was on track and they should be "patient", when in fact he knew that it was not and that a newly formed Remuneration Team, not he, had the authority to approve any such program.  Even if Jackson had made such representations, I find any such reliance by Claimants was unjustified as Mr. Herlihy was intimately involved in the carry program development efforts and presentations made both before and after March 2007, which contained shifting terms, including many at variance with the Material Terms.

   In mid-April 2007, Mr. Herlihy reported to Mr. Jackson that if Istithmar's portfolio were to be liquidated at that time there would be no carry, because the investments had not generated sufficient return to meet the required preferred returns to investors.  Herlihy also "predicted", in an email exchange with Jackson, that over the following five years, i.e., through mid-2012, the carry program would generate only a total of $20 million for all participants, giving Claimants, based on the 1.5 carry points in their Contracts' Material Terms, $1.5 million each over five years.  This prediction was made months before the global financial crisis erupted

and the fall in Istithmar's portfolio's value. Mr. Herlihy acknowledged at the time to Mr. Jackson that "we only make money if they [Istithmar] make a lot of money." (RX 45)

Mr. Herlihy was also Istithmar's main point of contact with the consultants that Istithmar retained in 2007 and 2008 to review the proposed carried interest plan. He was well aware of the status and substance of their reviews.

In October 2008, Istithmar's Board of Directors called for formation of a Working Committee to finalize the terms of a revised carried interest program and to engage advisors "to structure and implement the Carry Program", subject to the Chairman's approval. (CX 58, pp. 7-8; CX 65)  In November 2008, Istithmar's Chairman issued a resolution authorizing the implementation of a carried interest program in accordance with the key terms that were approved by the Board in October 2008. (CX97)  The Resolution created a Carry Program Working Committee, which was "authorized to finalize the details of the Carry Program and take all necessary and appropriate actions, in its absolute discretion, on behalf of Istithmar World to implement the Carry Program." (CX 97).  The five Working Committee members were Jackson, Herlihy , Ahmed Bin Fahad, the CEO of IW Ventures, Dr. Lai Boon, Chief Investment Officer of Dubai World, and Maryam Sharaf, Chief Financial Officer of Dubai World. (*Id.*)  The Working Committee's actions required the support of three out of five of its members (one of which had to be Dr. Boon Yu or Ms. Sharaf. (*Id.*)  Claimants knew that the Dubai World representatives, not Mr. Jackson, would have the final word on whether or not a carry program would be implemented and on what terms.

Istithmar then retained the Linklaters firm to draft carried interest plan documents. According to Mr. Herlihy, beginning in 2009, Mr. Jackson asked Claimants to "slow down the implementation of the carried interest program." (Tr. 524:9-22)  In March 2009, Mr. Herlihy gave an update on the potential carry program to Istithmar's Board of Directors.  His remarks reflected his understanding that substantial work remained to be done with Linklaters and the Working Committee to progress the carry program.  There were never any final decisions by the Working Committee on many of the basic elements of the carry plan under discussion, including how any catch-up payments on previously-exited investments would be calculated, which corporate investments would be excluded from a carry program, or the allocation of carry points among the investment professionals.  The Working Committee never finalized a carry program.

In sum, before Claimants commenced employment and throughout their employment numerous drafts of carry program terms were prepared and discussed.  Mr. Herlihy played a lead role in this process.  The terms in many of those drafts differed in significant ways from each other and from the Contracts' Material Terms.  Claimants seek compensation in this arbitration under carry program terms that differ in significant respects from the Material Terms in their Contracts and that were never finally approved, adopted or implemented by Istithmar.  They rely on the Parties' course of performance to substantiate their claim as to the approval and terms of a carry program.  However, the course of performance and other evidence do not support a finding that a program on the terms alleged – or on any terms -- was finally approved and adopted as the Contracts' required.

4.    Was the Failure to Implement a Carry Program and Grant Claimants Participation Interests a Material Breach of the Contracts?

I find that Istithmar's failure to implement a carried interest program and grant Claimants Participation Interests in such a program was not a material breach of the Contracts for the reasons discussed below.  Moreover, even if it were, Claimants received the liquidated damages for which they bargained in the event they were not granted such Interests.

*The Resignation for Good Reason Provisions*

Adoption of a carry program was very important to Claimants.  Mr. Jackson testified that he knew carried interest was "essential" to the Claimants.  He said he committed to them there would be a carried interest program but told them that if one were not implemented and they were not granted Participation Interests within six months and a day of their commencement of employment, the Contracts gave them an out – the right to resign for "Good Reason" and to collect $1 million each in payments and other benefits.  The Parties dispute whether this remedy was a liquidated damages clause and Claimants' exclusive damages remedy for Istithmar's failure to grant them Participation Interests and for the other grounds on which their Good Reason resignations and their claims in this arbitration are based.  For the reasons set forth below, I conclude that it was.

The Contracts provided that Claimants could resign for "Good Reason", as defined in Annex II (p. 9), providing they adhered to certain notice requirements.  Claimants demanded inclusion of these terms.  There were four grounds that constituted "Good Reason" to resign:  (i) without Claimants' consent, any material diminution in their duties or responsibilities

from their duties and responsibilities "immediately prior to such change", (ii) *a material violation of the Contract by Istithmar*, (iii) the relocation of their own principal office to a location other than New York City, Dubai or another mutually acceptable location, and (iv) *"the failure of the Company to grant you within six months of your Commencement Date your Participation Interest Points in accordance with the Material Terms* as set forth in Annex II below." (Emphasis added)  A fair inference to be drawn from the distinction in this provision between the failure to grant Participation Interest Points and a "material violation of the Contract" is that the former was deemed by the Parties to be something other than a material violation of the Contract.

The fourth Good Reason event (the failure to grant Participation Points) was added to that provision the weekend of September 2, 2006, just prior to finalizing the Contracts, to give Claimants clear rights in the event (which was foreseen as a possibility) that they were not granted Participation Interests. (Respondent's Exhibit ("RX") 193)  Jackson testified that this provision was added, as was the provision in Section 1.11 for an additional severance payout of $650,000 (bringing their total severance payout to more than $1 million plus benefits), to protect Claimants from the contingency where a program had not been implemented. (Tr. 1843:21 – 1846:17)  The negotiating history of these provisions shows that the $650,000 severance provision was added by Claimants in their September 4, 2006 comments to the then pending draft of their contracts, at the same time they were negotiating inclusion of the failure to grant participation interests as a Good Reason ground. (RX 193)  Contemporaneous email exchanges reflect the objection of  Peter Jodlowski, Istithmar's Chief Financial Officer, to adding the failure to grant Participation Interests within six months as a ground for a Good Reason resignation.  Mr. Jodlowski expressed  concern that it was far too generous to pay Claimants $1 million if a carry program were not implemented within six months since implementation of a carry program was beyond his and Mr. Jackson's control and unlikely to be done within that time period. (RX 207)

The Company was to have ten days following written notice of the conduct that was the basis for the potential resignation for Good Reason to cure such conduct.  If the 10-day cure period passed without a cure, Claimants had the right to resign upon providing the Company with not less than 3 months prior written notice of the date of termination of the Contracts.

Section 1.11 of the Contracts set forth the remedies available in the event Claimants properly resign for "Good Reason", as follows: (i) continued payment of Basic Salary

15

for the 12-month period immediately following the termination date ("Severance Period"), (ii) continuation of Company Payments for healthcare benefits until the earlier of 18 months from their employment termination date to their enrollment in another employer's group health plan, (iii) Severance of $650,000 (as defined in Annex II) to be paid ratably over the Severance Period, and (iv) full vesting of Claimants' Participation Interests as set forth in Annex II.

As described above, all of the events summarized in Claimants' Notice of Reasons took place more than a year prior to their resignation and, in many cases, within a few weeks of their commencement of employment in 2006.  Claimants' delay in sending the notices effectively denied Istithmar the ability to cure the challenged conduct.

Notwithstanding what it claims were defects in Claimants' notices, Istithmar paid or provided to them the amounts and benefits specified in Section 1.11 (i)-(iii), namely (a) base salary of $400,000 for 12 months; (b) health care coverage for 18 months; (c) a severance payment of $650,000 (paying them each a total of $1,050,000).  With regard to (iv),  Istithmar's position was and is that since no carry program had been implemented and no Participation Interest Units had been "granted" to Claimants, there were no Interests to "vest" and thus no payment of carried interest required.

Claimants do not dispute that they were never granted Participation Units.  Indeed, one of Claimants grounds for resigning for "Good Reason" in July 2009 was Istithmar's  failure "to grant [them] within six months of [their] Commencement Date [their] Participation Interest Points in accordance with the Material Terms as set forth in Annex II..." (CX 2027)  Claimants argue that Section 1.11(iv)'s statement that their Participation Interests will "fully vest" required Istithmar to pay them their expert's projected value of the Participation Interests they speculate they would have received had a carry program on terms they selected from among those discussed been approved and implemented.

The unambiguous terms of the Contracts do not support Claimants' reading. The Contracts make clear that the Parties knew the difference between "vest" and "grant" and how to use the two terms.  Annex II's definition of "Good Reason" includes the Company's failure to "grant" Participation Interest Points. Annex II also provides, in language Claimants drafted, "You will be *granted* participation interests in the existing investments made by the Company." (CX 29 at  10)  In contrast, the Material Terms, which Claimants also drafted, refer to "*vesting* of participation interests." (CX 29 at 11)   Mr. Herlihy acknowledged that "granting" and "vesting"

16

are different concepts; unless something has first been granted there is nothing to vest. (Tr. 609:9-610:2)

Courts "assume that the same words have the same meaning…and that the choice of substantially different words to address analogous issues signifies a different approach. . . .This approach also accords with the basic contract principle that the meaning of separate contract provisions should be considered in light of one another and the context of the entire agreement." *Int'l Fidelity Ins. Co. v. County of Rockland,* 98 F. Supp.2d 400, 412 (S.D.N.Y.2000) (internal citation and quotation marks omitted (omissions in original)).

It is undisputed that no carry program was ever implemented and no Participation Interests were "granted". From a reading of the entire agreement, the meaning of these terms is clear. And if it were not, the Contracts' negotiation history makes clear that the Claimants understood the difference in meaning between "vest" and "grant". Had the Parties intended Section 1.11 to provide for a *grant* of Participation Interests, rather than the *vesting* of Interests previously granted, they could have so provided by amending Section 1.11 when they added the failure to grant Participation Interests as a Good Reason ground for resignation. They did not. Claimants' syllogistic argument that Section 1.11 was intended to entitle them to a grant of Participation Interests in the event they resigned because they had not been granted such Interests makes no sense and eviscerates the plain meaning and purpose of that provision.

The parties clearly contemplated that the implementation of a carry program and the grant of such interests might take longer than six months. Indeed, Messrs Amato and Herlihy wanted this provision as protection in the event they were never granted their Participation Points. (Tr. 1845:4-1846:17) Istithmar agreed to provide Claimants the remedy of resignation in that event with an agreed compensation package – a remedy which, for the reasons discussed below, I find to be a liquidated damages provision and their exclusive damages remedy.

## IV. ANALYSIS

### A.   What Remedies Were/Are Available to Claimants Under the Contracts for the Failure to Implement a Carried Interest Program and Grant Them Participation Interests?

#### 1.   Is Section 1.11 a Liquidated Damages Provision?

The question before me is whether Section 1.11 of the Contracts is a liquidated damages provision and, if so, whether it provides the sole remedy for a resignation under the

Contracts' grounds for a Good Reason resignation, including Istithmar's failure to grant

Claimants Participation Interest Units in a carried interest program within six months of the start

of Claimants' employment. I hold that it is and that because Claimants elected to terminate the

Contract and recover liquidated damages, albeit long after many of the alleged breaches and

activities occurred, they cannot recover additional damages for that conduct.

   Section 1.11 and the definition of Good Reason in Annex II of the Contracts

unambiguously provided a specific remedy in the event Claimants were not granted Participation

Interests in a carry program: to resign for Good Reason and receive specified payments and

benefits, including severance payments, exceeding $1 million each, which they received. The

provision delineates, clearly and unambiguously, the monetary consequences of a failure to

perform:

   A "contract provision constitutes a valid liquidated damages clause" when it

"plainly delineate[es]…damages in the event that [a party] fail[s] to perform." *Lease Corp. of Am.*

*Inc. v. Resnick*, 288 A.D.2d 533, 534, 732 N.Y.S.2d 266, 268 (3d Dep't 2001). Courts have

regularly confirmed that contractual provisions for severance payments, like the payments made

to Claimants, operate as liquidated damages provisions. *Boyle v. Petrie Stores Corp.*, 136

Misc.2d 380, 390, 518 N.Y.S.2d 854, 860 (N.Y. Sup. Ct. 1985); *Am. Capital Access Serv. Corp.*

*v. Muessel*, 11 Misc.3d 1066(A), 2005 WL 3878980, at *5 (N.Y. Sup. Ct.). *See also Boone v.*

*Platinum Tech., Inc.*, 2000 WL 33119415 at *4, 5 (E.D. Pa.) ("Severance pay provisions are the

functional equivalent of liquidated damages clauses…" and "are a classic type of damages clause

regarding a loss which is difficult to estimate with precision.").

   "Good Reason" provisions are increasingly being included in executive

employment agreements as a basis for severance payments and other benefits so that the

employment agreement "provide[s] for the certainty of liquidated damages rather than relying

upon the uncertain outcomes associated with litigation…" Margaret de Lisser & Jonathan Ocker,

*Dissecting Terminations Under an Executive Employment Agreement,* The Metropolitan

Corporate Counsel (July 1999).

   Claimants elected to receive liquidated damages in 2009 by invoking their

Contracts' "Good Reason" clauses, resigning, terminating the Contracts and receiving the

payments and benefits specified. Their demand a year later for additional damages in the form

of huge payments based in large measure on speculative future revenues derived from a

hypothetical carry model runs directly counter to the rationale of the liquidated damages provision they proposed and then invoked – avoiding speculative damage claims. "Liquidated damages are particularly appropriate 'where actual damages are uncertain and difficult to ascertain or are of a purely speculative nature.'" *CPMI, Inc. v. Kolaj*, 65 A.D.3d 605, 607, 885 N.Y.S.2d 496, 497 (2d Dep't 2009) (internal citations omitted).

Here, given the inevitable speculation that would arise if a carry program were not implemented, it was in all parties' interest to define liquidated damages to avoid the need for speculation in that event. As Respondent's expert, Professor Blaydon, testified, with an actual private equity fund, "you wait to see how the investments play out. You don't end up arguing about what's the valuation. You know what it was. You only pay money when it's realized and real money is paid out to the investors." (Tr. 3008:23-3009:5).

A liquidated damages provision need not be expressly labeled as such, nor even state that it was to be the exclusive remedy in the event of breach. "Such an approach would put too much faith in form and too little in substance." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd Inc.*, 41 N.Y.2d 420, 425, 393 N.Y.S.2d 365, 369 (N.Y. 1977).

Liquidated damages are the exclusive monetary remedy and preclude any recovery of additional damages: "A liquidated damages provision provides an agreement's 'exclusive remedy' in the sense that such a provision 'precludes any recovery of actual damages.'...[This] ensures that parties do not have an option, post-breach, to choose between liquidated or actual damages depending on which is greater, thus defeating the certainty that is the point of liquidated damages provisions." *GFI Brokers, LLC v. Santana,* 2008 WL 3166972, at *11 (S.D.N.Y.) (internal citations omitted). Here, Claimants want it both ways: having received the specified damages, they now seek to recover additional damages.

Claimants cited no authority that supports their position that the Good Reason provision is not a liquidated damages provision. They incorrectly paraphrased the holding of *Papa Gino's of America, Inc. v. Plaza at Latham Assocs.*, 524 N.Y.S.2d 536, 538 (3d Dep't 1988), as providing that a contract clause setting forth a specific remedy will not bar an injured party from seeking another remedy for breach of the contract "unless there is explicit language that [the [contractual remedy] is to be the sole remedy for a breach.". That was not an employment case but a case involving a real estate lease. The court in *Papa Gino's* said that "a liquidated damages clause does not bar the *equitable relief* of specific performance unless there

19

is explicit language that it is to be the sole remedy for a breach". 135 A.D.2d at 76, 524 N.Y.S.
2d at 538 (emphasis added). That ruling confirmed that the liquidated damages remedy was the
sole monetary remedy. The only other case Claimants cited similarly held that the existence of a
liquidated damages clause did not preclude the injured party from seeking specific performance.
It did not address the availability of further monetary relief. *Edge Group WAICCS LCC v. Sapir
Group LLC*, 705 F. Supp.2d 304 (S.D.N.Y. 2010)

       A liquidated damage provision will not be enforced if it is against public policy to
do so and public policy is firmly set against the imposition of forfeitures or penalties for which
there is no statutory authority. There is no claim by either party that enforcement of the Good
Reason provision here would be unconscionable or a penalty and I conclude it would not be.
Indeed, Claimants invoked it and Respondent complied with it. Accordingly, Claimants have
received the remedy for which they bargained.

       Claimants cite two cases, *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 211 A.D.2d
262, 629 N.Y.S.2d 382 (1st Dep't 1995), and *Cauff, Lippman & Co. v. Apolgee Fin. Group, Inc.*,
807 F. Supp. 1007 (S.D.N.Y. 1992), for the proposition that if a condition necessary to effectuate
the bargain between the parties is within the control of one party, that party may not refrain from
fulfilling that condition and then claim the failure of that condition as a defense. They argued
that this proposition precludes Istithmar from invoking its failure to approve and implement a
carried interest plan to deny Claimants the remedy they sought under Section 1.11 and seek in
this arbitration. Neither of these cases, however, has application to a situation in which, as here,
the parties expressly recognized and provided for a liquidated damages remedy in the event the
contemplated condition was not fulfilled.

       Even if I had concluded that Section 1.11 was not a liquidated damages clause
and Claimants were in theory entitled to additional damages for their breach of contract claims,
the damages Claimants requested are far too speculative and uncertain to be granted. Claimants,
through their expert Timothy Cummins, offered as their economic damages a range of estimated
carried interest proceeds that were based upon multiple assumptions as to carry program terms
they cherry-picked from the Material Terms and the various draft carry programs that were
considered by Claimants, Istithmar and its advisors during Claimants' employment. Among
other questionable assumptions, these calculations were based in large part upon guesses about
future realizations on investments that had not been exited, the inclusion of investments with

good returns but which would not have been included in the carry pool under some of the contemplated terms, and the exclusion of investments from the carry pool that performed poorly and would have diminished the portfolio's returns. Mr. Cummins' own testimony confirms the speculative nature of his calculations. He acknowledged that certain of the proceeds "are prospective, they're from as-yet-unrealized investments that are going to be realized at dates that are as-yet-undetermined, they haven't occurred yet, and in amounts that are at this point estimated rather than certain...." (Tr. 1552:14-19)   Courts regularly reject such hypothetical exercises. "Multiple assumptions will doom a projection" of future value because "multiple assumptions doom reasonable certainty." *Wey* v. *New York Stock Exchange, Inc.*, 15 Misc.3d 1127(A), 2007 WL 1238596 at *12 (N.Y. Sup.)

   Claimants were unable to cite any case in which a court has fashioned the terms of a carried interest plan and then awarded damages based upon that plan. The cases they did cite – *Capobianco et al.* v. *Vulcan Inc. et al.* (Arbitration Award, July 29, 2009), a private arbitration award,  and *Taussig* v. *Clipper Group, L.P.*, 21 Misc.3d 1129(A), 2004 WL 5644707, at *6 (N.Y. Sup.), *aff'd*, 16 A.D.3d 224, 790 N.Y.S.2d 602 (1st Dep't 2005) --,  involved decisions about entitlements under existing incentive compensation programs that had been implemented. They did not involve what Claimants seek here: the construction of a hypothetical carry program upon terms that differ even from those set forth in their Contracts.  In any event, the evidence established that it was highly unlikely Claimants would have received any proceeds even if a carry program based on their Contracts' Material Terms had been approved and implemented. Whereas Mr. Cummins devised a damages model from a range of terms, many of which were not reflected in their Contracts, Respondent's expert, Professor Blaydon, calculated that even under the Contracts' Material Terms, realized profits from every annual pool of investments would not have yielded sufficient returns to Istithmar to allow for payment of carry. (Tr. 2989:12-2990:18; RX 757, Revised Ex. 5)  Moreover, of the 20 investments Claimants claim they were responsible for managing (CX 1810 at 60), only 8 had been fully exited as of the end of 2010 and Mr. Cummins' report shows that Istithmar lost $99.6 million of its $764.4 million investment on those investments.  For all the 20 investments, Cummins' numbers show – and he acknowledged – that through year-end 2010 Istithmar had gained only $69.2 million on invested capital of $1,355 billion, or a total return of only approximately 5%. (Tr. 1718:17-1722:18) Professor Blaydon showed that the annual rate of return using Cummins' numbers has been only 1.85%

(RX 755), which is far below the annual hurdle rates that the Material Terms specified would have to be met before there could be any proceeds distributed to Claimants and other potential carry program participants.

I find that Claimants' claims for damages based upon hypothetical, speculative carry calculations constitute an impermissible attempt to rewrite their unambiguous contracts and, even absent the liquidated damages clause, could not form the basis for a recovery of loss.

2.    Did Claimants Waive their Contract Claims?

Respondent argues that Claimants waived their right to claim damages for the breaches they allege by waiting up to three years to provide notice of them to Respondent. Claimants established that they complained orally to Mr. Jackson about some, but not all of the alleged breaches although no formal, written complaints or notices of breach were made until July 2009. New York law provides that a "waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection." *Island Estates Mgmt., Inc. v. MBA-Manorhaven, LLC*, 21 Misc.3d 1121(A), 2008 WL 4700416, at *6 (N.Y. Sup.).  I need not decide the issue of waiver as I find that Claimants receipt of the liquidated damages provided in their Contracts bars them from recovering damages for their claimed breaches in excess of those for which they bargained.

**B.    Claims of Fraudulent Inducement, Breach of Oral Promises,  and, Alternatively, Promissory Estoppel**

Claimants claim that Mr. Jackson made a series of promises, not contained in the Contracts, to fraudulently induce them to enter into the Contracts and thereafter to remain employed.  They also claim these promises constituted enforceable oral agreements or, alternatively, entitle them to damages under the doctrine of promissory estoppel.  Many of these assertions are barred from consideration because they are at variance with or would add to the unambiguous terms of their fully integrated Contracts; others are not supported by the evidence.

Claimants claim Mr. Jackson promised, prior to their joining Istithmar, that (i) they would have $3 billion from Dubai World and another $1 billion a year from third parties to invest each year, (ii) Istithmar would be the sole alternative investment vehicle for Dubai World, (iii) Istithmar made investments only for purposes of maximizing capital gains, (iv) Claimants would oversee all of Istithmar's investments, (v) they would be based in New York spending only as much time in Dubai as necessary, and (vi) a carried interest program would be put into

place at Istithmar. The last three topics are fully addressed in the Contracts and have been discussed above. The first three topics are nowhere reflected in the carefully negotiated Contracts. With regard to funding levels, Mr. Jackson testified that while he may have told Claimants the expectation was they would have oversight of $4 billion in new investment capital each year, he made no such guarantees, especially because each year Istithmar had to request its government investment allotment through a process akin to a government appropriations process. (Tr. 1827: 7-21) Nor, he said, did he ever guarantee that Istithmar would be the sole vehicle for investments by Dubai World (Tr. 1828:20-25; 1829:2-5), although Istithmar was the investment arm of the government until mid-late 2006 when Dubai World was formed. (Tr. 1828:6-19)

There is nothing in the Contracts that guaranteed either that Dubai World and its other affiliates would make all investments through Istithmar or that Claimants would oversee investments made by entities other than Istithmar. To the contrary, the Contracts distinguished Istithmar from other members of the Dubai Government "Group" and confined Claimants' responsibilities to Istithmar. The Contracts made clear that at least real estate investments might be managed by another entity, as happened shortly after Claimants commenced employment. (Annex II, p. 8) The Contracts nowhere specified that all investments would be capital gains driven.

Claimants' testimony was evasive as to whether Jackson made firm commitments; they claim they inferred commitments from his statements about Istithmar's then status and his expectations about what financing would be. (Tr. 1151:16-1152:5; 3197:20-3199:24) At the hearing, Mr. Amato testified that at Istithmar, unlike at a typical private equity fund, there was not a "prescribed pool of capital". It was more of an "evergreen structure". (Tr. 1158:23-1159:23) Mr. Herlihy's email to a relative shortly after joining Istithmar contradicts Claimants' allegations about the financing that would be available and their own expectations. He referred to joining Istithmar as "a big bet on the region (middle east)" and stated that Istithmar was investing about $1 billion a year, not the higher numbers Claimants testified at the hearing they were promised. (RX 535)

Claimants have failed as a matter of law to establish their fraudulent inducement claim, "[t]he essential elements of [which] are 'the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury.'" *Tourneau, LLC v. 53rd & Madison Tower Dev.*

23

*LLC,* 896 N.Y.S.2d 631, 637 (N.Y. Sup. Ct. 2010) (*quoting Braddock v. Braddock*, 60 A.D.3d 84, 86, 871 N.Y.S.2d 68, 70 (1ˢᵗ Dep't 2009)).  None of these elements is present here.

Statements merely conveying expectations or predictions of future actions or conduct, like those of Mr. Jackson on which Claimants base their claim, cannot, as a matter of law, sustain a fraud claim, because such expressions are not representations of an existing fact. *See Deutsche Bank Nat. Trust Co. v. Sinclair*, 68 A.D.3d 914, 916, 891 N.Y.S.2d 445, 447 (2d Dep't 2009); *Rand v. Laico*, 282 A.D.2d 444, 722 N.Y.S.2d 405 (2d Dep't 2001).

Claimants have also failed to prove that the alleged statements were both false and known by Mr. Jackson to be false when made.  Mr. Amato conceded that Claimants have no basis for claiming that Jackson knowingly misrepresented anything. (Tr. 1141:19-1142:12)  I find that the evidence does not support such a finding.

Nor did Claimants establish, as they must under New York law, that their "reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it." *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 419 (S.D.N.Y. 1992).  Mr. Jackson was the CEO of Istithmar, not of Dubai World.  Claimants could not have reasonably believed that Jackson had the power to commit Istithmar's parent—and through it the Dubai Government – for years into the future as to the amount it would invest and how it would structure its investments.  Jackson made clear during the drafting of the agreements that his authority was limited, including that he could not commit to any carry program. Claimants' insistence on the remedy of resigning for good reason if no carry program was implemented shows they were aware of that possibility and negotiated a severance payment to address it.

Claimants' claim to damages for Istithmar's alleged "promises" to them, after they commenced employment, of ever higher carry participation interests and that "corporate" investments would be excluded from any carry program also are not supported by the record. Although there were discussions about those matters in the context of considering alternative carried interest program terms, the record does not support a finding that any enforceable commitments were made.  Herlihy recognized in late November 2008 that his "existing contract" provided for only 1.5 participation points. (RX 32)  He also acknowledged that the list of "corporate" investments "changed over time" (Tr. 2205:24-2206:9) and that any designation of

24

"corporate investments would require the Working Committee's and thus Dubai World's approval. (RX 284) Claimants' reliance on statements from Mr. Jackson after they had commenced employment as having modified their contracts, when Istithmar's Chairman, not he, had executed their Contracts and when it should have been clear to them, at least as of April 2007, that he had been stripped of his authority over the carried interest program, was not reasonable. At all times, Mr. Jackson's authority was subject to approval of the Chairman.

Under New York law, prior discussions are subsumed by the execution of a written contract that appears complete on its face, even absent an integration clause. However, where, as here, there is no merger clause, I "must determine whether or not there is an integration 'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in writing.'" *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1196 (S.D.N.Y. 1996) (internal citations omitted). Having examined the Contracts and the circumstances surrounding their negotiation and execution, I conclude that the Parties intended them to address fully the issues of the terms of Claimants' employment. Thus, the Claimants' claim for breach of these alleged "promises", which the record establishes were rather statements of expectations, cannot be used to vary or contradict the terms of the Contracts and cannot form the basis for either independent breach of contract claims or fraudulent inducement claims.

Claimants' promissory estoppel claim is also barred as New York law does not recognize promissory estoppel in the employment context. *Rojo v. Deutsche Bank*, 2010 WL 2560077, at *7 (S.D.N.Y.) (rejecting a claim for promissory estoppel based upon alleged oral promises made during employment negotiations where there was a valid contract). *See also Henry v. Dow Jones*, 2009 WL 210680, at *5 n.8 (S.D.N.Y.) (Accord)

I find that these alleged promises are not enforceable under any of the above theories and deny each of these claims, as well as the related claims for punitive and other damages.

### C.  Harm to Reputation Claim

Claimants asserted in their Demand that their association with Istithmar's investment style, over which they had no control and which they opposed, has harmed their reputations and prevented them from obtaining employment. Under New York law, no claim of "injury to reputation" exists separate from a claim for defamation. *See Hall* v. *United Parcel*

*Serv. of Am., Inc.*, 76 N.Y. 2d  27, 32,  556 N.Y.S.2d 21, 24 (1990) ("Injuries to an individual's personal and professional reputation…have long been compensated through the traditional remedies for defamation.")   To prove defamation under New York law, a claimant must show "a false statement [made by the respondent], published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard." *Epifani v. Johnson*, 65 A.D.3d 224, 233, 882 N.Y.S.2d 234, 242 (2d Dep't 2009) (internal citations omitted).

Claimants did not allege defamation or any false statement in their Demand and failed to establish the elements of a claim for defamation at the hearing.  Claimants appeared to rely, at the hearing, for their "harm to reputation" claim on a press release issued by Istithmar which confirmed that Messrs. Amato and Herlihy "have advised Istithmar of their plans to depart the company to explore other opportunities." (CX 465)  This release was an accurate statement of the fact of Claimants' resignation and thus cannot provide a basis for a defamation claim on the theory, as Mr. Herlihy stated, that it was "code that we've been fired." (Tr. 580:9-16) *Panghat v. New York Downtown Hosp.*, 85 A.D.3d 473, 473-74, 925 N.Y.S.2d 445, 446 (1st Dep't  2011); *Cutler* v. *Ensage, Inc.*, 18 Misc.3d 1101(A), 2007 WL 4372919, at *7 (N.Y. Sup.).

Further, Claimants offered no evidence, other than their own testimony about general job searches, of any specific attempts to find employment or that anything Istithmar said prevented them from obtaining employment.  Rather, the record supports a finding that Claimants have deferred following up on employment prospects while they tended to this arbitration proceeding.  Accordingly, Claimants' harm to reputation claim is denied.

### D.    Other Damages Claims

Although not set forth in their Demand, Claimants demanded for the first time shortly before the hearing compensation for bonuses allegedly due them for 2008 and 2009. However, the Contracts guaranteed bonuses only for 2006 (pro-rated) and 2007; not for 2008 and 2009, as Mr. Amato acknowledged at the hearing. (Tr. 1185:17-21)  The Contracts further provided that if any bonus was paid, "payments shall be made when such bonuses are paid to other executives of the Company." (Contracts, Section 2.3, p. 3)  No executives at Istithmar were paid bonuses for work in 2008 and 2009.  I deny the claim for bonus payments and, to the extent not explicitly addressed herein, all of Claimants' other damages claims.

26

## AWARD

For the reasons stated above, I hereby Award as follows:

1.    Claimants' claims are denied and dismissed in all respects.

2.    The compensation and expenses of the neutral Arbitrator totaling $218,022.44, shall be borne equally by the Parties.

3.    The administrative fees and expenses of the ICDR totaling $71,050.00, shall be borne by the Parties as incurred..

4.    All Parties have requested an award of attorneys' fees and costs. I have determined that it is appropriate in this case for each Party to bear the fees and costs of his/its own attorneys and experts and the costs of presenting his/its case.

5.    This Award is in full settlement of all claims submitted to this Arbitration. To the extent any such claim is not specifically mentioned herein, it is denied.


I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.


Dated:  New York, N.Y., U.S.A.


March 15, 2012

_Dana H. Freyer_
Dana H. Freyer, Arbitrator


State of New York        }
                          } SS:
County of New York       }


On this 15th day of March, 2012 before me personally came and appeared Dana H. Freyer, to me known and known to me to be the individual described in and who executed the foregoing instrument and  acknowledged to me that she executed the same.

_March 15 2012_
Dated

_Tina M Albano_
Notary Public

TINA M ALBANO
Notary Public, State of New York
No. 01AL4960509
Qualified in New York County
Commission Expires Dec. 26, 2013

27